## SEIMER v. JAMES DICKINSON FARM MORTGAGE CO. et al.

(District Court, E. D. Illinois April 17, 1924.)

**1. Corporations ⊛═401—Individuals and corporations owned by them held liable for fraud of one for benefit of all.**

Where three corporations were practically owned and controlled by two men, whatever one of them did bound the other as respected fraud in sale of land, especially where state statute (Acts Tex. 1919, c. 43 [Vernon's Ann. Civ. St. Supp. 1922, arts. 3973a–3973c]) renders all persons benefiting from fraud jointly and severally liable.

**2. Fraud ⊛═58(1)—Evidence held to show fraud in sale of land.**

In action for fraud in sale of land, evidence and facts *held* to show fraudulent representations and reliance thereon to plaintiff's damage.

**3. Corporations ⊛═401—Conspiracy among corporations basis for action of fraud.**

Should a successful conspiracy amongst corporations be carried out by same officers and their representatives, it is sufficient basis for action of fraud when damage results.

**4. Fraud ⊛═11(1)—Representations as to quantity or quality actionable.**

False representations as to quantity or quality, when made as a statement of fact, are actionable.

**5. Fraud ⊛═11(1)—Representations as to conditions of soil actionable.**

False representations as to particular conditions of soil, such as tiling, earnings, selling price, alkali, and irrigation, are statements of fact, and actionable.

**6. Fraud ⊛═12—Representation as to future by one professing knowledge actionable.**

False representation and promise as to what will result in future, when made by one professing to have superior knowledge, based on experience, will support allegations of fraud.

**7. Fraud ⊛═11(1)—Statements of opinion, known to be false, actionable.**

False statements, partaking of nature of opinion or promissory character, known to be false to maker, and relied on, are actionable.

**8. Fraud ⊛═54—Evidence of other transactions admissible to show intent.**

In action for damages for fraud in sale of land, evidence of other transactions at about the same time was admissible to show intent, when it appears there is such a connection as to furnish inference that the transactions are a part of one schedule or plan, in which the same motive is operative, and remoteness in point of time affects only weight.

**9. Fraud ⊛═49—Variance in name of party to contract immaterial.**

There was no material variance, where declaration charged that plaintiff contracted to buy from defendants, whereas written contract produced was with another party; plaintiff being compelled to show only that she contracted with defendants or some one else, if in fact she was damaged by fraud; the words "with defendant" being surplusage.

**10. Limitation of actions ⊛═100(5)—Statute does not run until discovery of fraud.**

Limitations does not run against an action of deceit until discovery of the fraud by exercise of due diligence.

**11. Limitation of actions ⊛═88—Foreign corporation held "absent" defendant, in favor of which statute did not run.**

A foreign corporation is "absent" from state, and limitations does not run in its favor, though it has general agents in state.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Absence—Absent.]

---

**12. Fraud ⬅61—Court warranted in assessing exemplary damages.**

In action for damages for fraud in sale of land in Texas, circumstances *held* to warrant court in exercising its discretion by assessing exemplary damages, as authorized by Acts Tex. 1919, c. 43 (Vernon's Ann. Civ. St. Supp. 1922, arts. 3973a–3973c).

At Law. Action by Cora Seimer against the James Dickinson Farm Mortgage Company and another. Judgment for plaintiff.

Parkinson & Parkinson, of Lafayette, Ind., and Walter T. Gunn, Fred B. Penwell, and Harold F. Lindley, all of Danville, Ill., for plaintiff.

W. F. Zumbrum, of Kansas City, Mo., and Rearick & Meeks, of Danville, Ill., for defendants.

LINDLEY, District Judge. This is an action of trespass on the case, wherein the declaration alleges in two counts substantially that the plaintiff in 1920 was a resident of Vermilion county, Ill., unacquainted with irrigated lands and water rights in the state of Texas, and with the soil, climate, seasons, rainfall, etc., in Cameron county, Texas, and that defendants were owners of a tract of land, and conspired and combined to swindle the plaintiff by means of false representations and represented the land as worth $200 to $500 per acre, as having ample irrigation system and adequate water rights; that it would produce all crops that could be raised in Illinois, and would produce from three to five crops a year, and from $12,000 to $14,000 a year for each 40 acres; that the land was free from alkali, never had too much water, and never flooded; that every person who had bought similar land had become wealthy; that purchasers advanced only a small payment, and paid for the land out of its products; that labor could be had at from 75 cents to $1.25 per day; and that lands, when cleared, were worth from $1,000 to $2,000 per acre. It is alleged that defendants prevented plaintiff from seeing any of the local residents, and represented that the persons residing on the farms were bona fide owners, whereas they were servants and employés of the defendants; that markets were good and irrigation rights were perpetual; that the lands were uniform in quality and would raise eleven crops of alfalfa a year; and that the rent of the lands would pay the notes given. The plaintiff alleges that, relying upon said representations, she purchased the land, paying therefor $300 per acre, that all the representations were untrue, and that plaintiff has been damaged as a result to the full extent of the money expended for the land. The second count also sets out the statute of Texas hereinafter set forth which awards exemplary as well as compensatory damages.

The defendants are the James Dickinson Farm Mortgage Company, a Missouri corporation, and A. D. Dickinson, a resident of the state of Texas. The defendants filed pleas of the general issue and the statute of limitations. The plaintiff replied that the fraud was not discovered within time to prevent the statute from running and that the corporate defendant was a nonresident of the state of Texas, and therefore absent within the meaning of the Texas statute. Issue was joined

---

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

on these replications. Trial by jury was waived and trial had before the court. The plaintiff offered ample evidence to support her declaration and replication, and defendants rested upon the case thus presented.

[1] From the testimony and the circumstances in evidence one is inevitably led to the conclusion that this land sale was one growing out of a scheme or plan for buying unimproved Texas land, subdividing it, laying out of roads thereon, and then selling it to colonists brought in to the Rio Grande valley from other states. In this scheme three corporations appear with various activities—the Lone Star Immigration Company, the James Dickinson Farm Mortgage Company, a Missouri corporation, and the James Dickinson Farm Mortgage Company, a Texas corporation. The chief officers of each were one Lee James and one A. D. Dickinson, who were jointly, in approximately equal parts, the owners of over 90 per cent. of the capital stock of each corporation. The Lone Star's activities were confined to selling the land. The Texas corporation owned the land, but the legal title was in one Thomas, who was bookkeeper and secretary of either the Texas or the Missouri corporation. The Missouri corporation capitalized at $1,000,-000, advanced the money to the Texas corporation, capitalized at $25,-000, to buy the land, and, when the Lone Star sold the tracts of land, the conveyances were made by Thomas, and the consideration was delivered in part to the Lone Star, in part to the Texas corporation, and in part to the Missouri corporation, to reimburse it for the funds it had advanced for the purchase. The amount of benefit accruing to each of said parties does not appear, and is immaterial. When the Lone Star dealt with the Texas corporation or with the Missouri corporation, and when either or both of the other companies dealt with it or with each other, Dickinson and James dealt with themselves. Being the executive officers of the three corporations, as well as the substantial owners thereof, they, in three different capacities, necessarily dealt, conversed, planned, and designed with themselves, merely performing their individual activities through three different nominal legal entities, all constituting a part of a single comprehensive activity, for whom the two men were responsible and from which the same two men would lose or profit.

Plaintiff bought 20 acres. She paid for it $6,000, $3,000 in cash and $3,000 in notes, $1,500 of which went to the Missouri corporation, and a like amount to a former owner, who had a lien upon the land. The other $3,000 was received and distributed by the Lone Star Company, to whom it does not appear, except that a part of it was paid for commissions and expenses. Thus the Missouri corporation was directly benefited by the money obtained, for it was reimbursed for money advanced to the Texas Company, for the purchase of land held by Thomas and conveyed to plaintiff. If the land was worthless, as claimed, the reception of the money was manifestly to the benefit and advantage of the Missouri corporation, for there was apparently no source for reimbursement for the purchase price advanced by it, except from the resale of the land. Evidently the arrangement between the Missouri company, the Texas company, the Lone Star, and Thomas was that these lands should be bought with money advanced by the

Missouri corporation, placed in Thomas' name for resale and resold by the Texas Company and the Lone Star by some arrangement between them not before the court. Dickinson and James were to all effects and purposes the owners, the officers, and the directors of all three corporations, and manipulated the three companies' activities to the common end of selling these lands and dividing the proceeds. They had a common purpose in view, a common plan, a common understanding, as to what was to be done. The interests of the three corporations were the same, so far as the people with whom they dealt are concerned, and their activities all originated in the brains and were effectuated by the efforts and supervision of two men, James and Dickinson. The three corporations, as far as this record reveals, had no purpose of existence except to carry out this common plan. Indeed, one might well conclude that there was in their existence and operation proof of sinister intent in their very organization.

Under such facts the inevitable conclusion is that what each of the corporations did, what James and Dickinson did, what any of their servants did in the pursuance of this common undertaking, would bind each and all of the others joining therein. Moreover, the Texas statute which controls here has some very pertinent provisions. That statute (Acts 1919, c. 43 [Vernon's Ann. Civ. St. Supp. 1922, arts. 3973a–3973c]) is as follows:

"Section 1. Actionable fraud in this state with regard to transactions in real estate or in stock in corporations or joint stock companies shall consist of either a false representation of a past or existing material fact, or false promise to do some act in the future which is made as a material inducement to another party to enter into a contract and but for which promise said party would not have entered into said contract, provided however that whenever a promise thus made has not been complied with by the party making it within reasonable time, it shall be presumed that it was falsely and fraudulently made, and the burden shall be on the party making it to show that it was made in good faith but was prevented from complying therewith by the act of God, the public enemy or by some equitable reason.

"Sec. 2. All persons guilty of fraud, as defined in this act, shall be liable to the person defrauded for all actual damages suffered the rule of damages being the difference between the value of the property as represented or as would have been worth, had the promise been fulfilled, and the actual value of the property in the condition it is delivered at the time of the contract.

"Sec. 3. All persons making the false representations or promises and all persons deriving the benefit of said fraud, shall be jointly and severally liable in actual damages, and in addition thereto, all persons knowingly and willfully making such false representations or promises or knowingly taking the advantage of said fraud shall be liable in exemplary damages to the person defrauded in such amount as shall be assessed by the jury, not to exceed double the amount of the actual damages suffered."

Under such statutes, if the common undertaking of the parties was conducted in a fraudulent manner, any and all of the parties are liable, for, as we have found, the fruits of the undertaking resulted in benefit to all.

[2-7] The proof is that the plaintiff, a woman residing in a village in Illinois, wholly unacquainted with land other than in her immediate vicinity, was approached by a land agent, who persuaded her and her son, some 22 or 23 years of age, to go with a party to Texas, at a total expense of $60 for both of them. Upon the trip the plaintiff was

a member of a party under the control and supervision of a representative of the defendants. During the trip they were given literature extolling the Rio Grande valley, taught songs set to familiar tunes, singing the praises of the land in the valley, and lectured to upon the alleged qualities of the soil. Upon arrival in Texas, the Pullman car was side-tracked some distance from the station, and the parties were loaded into automobiles and taken direct to certain show farms, where the various alleged proprietors were introduced by representatives of the defendants, and these men duly exploited in glowing terms the quality, character, productivity, and other alleged desirability of the land in the Rio Grande valley. After a number of such visits and exhibitions, the party, including the plaintiff, were taken to the defendants' community house, a sort of club or hotel some four miles from the nearest town, where they were well entertained and furnished with meals and lodging. After a day or two, when the parties were apparently in the proper receptive mental condition, they were solicited to make purchases. The plaintiff was taken into a small room with her son, and there presented with a contract, which, after considerable hesitation and reluctance, expressed to the parties presenting same, she signed.

Previous to this, after having been shown the show farms, she had been taken to the land which she eventually purchased. It was covered with brush, about the size of peach trees, and cactus, black, and apparently, to one who had been familiar with black soil in Illinois, of rich fertility. It was represented to her that it was the best land in the valley; that the irrigating plant would furnish water within 60 days after she purchased; that she would receive the best results from irrigation, because her land was near the water plant, and would receive more silt and alluvial deposit, since it was near the Rio Grande; that her land would produce citrus fruits in such quantity as to produce $1,000 to $2,000 net profit per year; that it would produce cabbages, tomatoes, potatoes, in fact, anything that would grow in the United States, in such quantities and of such quality that she could pay for the land in two crops; that she could rent it for $50 per acre cash rent, or for grain rent, getting one-third of the crops, with sufficient return to pay from $100 to $200 per acre; that the land could be cleared and the timber from the brush sold for enough to pay for the clearing; that she would have just the correct amount of water, just as much or just as little as she chose, and just at the time she desired it; that the land, when thus cleared, with water upon it, would be worth from $1,000 to $2,000 per acre, and in its uncleared and uncultivated state $300. Many other representations as to the fertility, quality, productivity, and other characteristics of the soil were made to her, and relying upon these she signed the contract, agreeing to purchase 47 acres at $300 per acre from the Lone Star Irrigation Company. Most of the dealing was with Lee B. James, who was likewise president of the James Dickinson Farm Mortgage Company, of Missouri. The evidence shows further that after she returned to her home she asked to be relieved of her part of the purchase, and finally, by verbal arrangement with defendant Dickinson, agreed to buy 20 acres, instead of 47.

She testified that she had paid all of the purchase price, except $900 remaining due upon one note, held by one Robb, who is not a party of this suit, and who is not concerned in this action.

After receiving a deed from Thomas, she cleared her land at an expense of $500, waited several months for the water, finally received it, and found almost every one of the representations made to her to be false. The land, instead of being of the character and quality she believed it to be, proved to be of such character that, when water was placed upon it, it grew hard in a cement-like fashion, and worthless for any after the first crops. The evidence showed that the land has no market value, no rental value, and is evidently of value only for speculative purposes. Some of the representations made were matters of opinion, but many were false representations of fact, and many were false promises. The circumstances under which she saw the land, the entertainment furnished her, and the scene and setting were all so well staged and well calculated as to bring about the result contemplated; and there is no question but that the plaintiff did in fact rely upon the misrepresentations made and that she has been defrauded.

This fraud was all in pursuance of the common undertaking, the acts of the three corporations and the individuals, constituting a conspiracy. Sometimes Dickinson transacted the business with the plaintiff, sometimes James transacted the business with her, and sometimes other parties, apparently solicitors and salesmen. It is most difficult to ascertain whether Dickinson and James were at various times acting as officers of the Lone Star or of the Texas Company, or the Missouri Company; but that question is immaterial, in view of the common scheme, in which each company had its function, and in which defendant Dickinson acted as an executive officer in all of said companies. The Missouri corporation was benefited by the fruits of the fraud, and received its share therefrom in the return of the money that it had invested for the purchase price in this purely speculative land. Dickinson received fruits of the fraud as one of the two owners of the three corporations. Thus both defendants were brought strictly within the terms of the Texas statute and the averments of the declaration.

The authorities are that, should a successful conspiracy amongst these several corporations be carried out by the same officers and their representatives, it is sufficient basis for an action of fraud when damage results. Place v. Minster, 65 N. Y. 89. False representations as to quantity or quality, when made as a statement of fact, are actionable. Strand v. Griffith, 97 Fed. 858, 38 C. C. A. 444; Green v. Turner, 86 Fed. 837, 30 C. C. A. 427; Henderson v. Henshall, 54 Fed. 320, 4 C. C. A. 357; Allen v. Henn, 197 Ill. 486, 64 N. E. 250; Ladd v. Pigott, 114 Ill. 647, 2 N. E. 503; Robey v. Craig (Tex. Civ. App.) 172 S. W. 203; Duncan v. Doyle, 243 Mass. 177, 137 N. E. 293. False representations as to the quality of real estate may constitute actionable fraud and deceit: Lehigh Zinc Co. v. Bamford, 156 U. S. 665, 14 Sup. Ct. 219, 37 L. Ed. 1215; Pryor v. Foster, 130 N. Y. 171, 29 N. E. 123. False representations as to particular conditions of soil, such as tiling, earnings, selling price, alkali, and irrigation, are statements of fact, and hence actionable. Baker v. Fawcett, 69 Ill. App. 300 (tile); Cross

v. Bouck, 175 Cal. 253, 165 Pac. 702 (past earnings); Allen v. Henn, 197 Ill. 486, 64 N. E. 250 (sale price); Lasman v. Calhoun, 111 Wash. 467, 191 Pac. 409 (irrigation); Hughes v. Lockington, 221 Ill. 571, 77 N. E. 1105 (price); Douglass v. Treat, 246 Ill. 593, 92 N. E. 976 (prices); Leonard v. Springer, 197 Ill. 532, 64 N. E. 299 (consideration). Representations as to ability to irrigate, quantity of water, etc., when false, constitute actionable fraud. Lasman v. Calhoun, 111 Wash. 467, 191 Pac. 409; Zavala Land Co. v. Tolbert (Tex. Civ. App.) 184 S. W. 523; Norton v. Stewart Land Co., 206 Mo. App. 662, 228 S. W. 838; Rabenau v. Harrell, 278 Mo. 247, 213 S. W. 92 (O. K.); Paschen v. Lovett (Tex. Civ. App.) 255 S. W. 385 (O. K.); Hill v. Wilson, 88 Cal. 92, 25 Pac. 1195. A false representation and promise as to what will result in the future, when made by one professing to have superior knowledge, based on experience, are, in effect, false representations of existing conditions, and support allegations of fraud. Wendell v. Ozark Orchard Co. (Mo. App.) 200 S. W. 747, citing Stonemets v. Head, 248 Mo. 243, 154 S. W. 108, supra. False statements partaking of the nature of an opinion or promissory character, known to be false to the maker and relied upon by the purchaser are actionable. Texas Cooperative Inv. Co. v. Clark (Tex. Civ. App.) 216 S. W. 220; Liland v. Tweto, 19 N. D. 551, 125 N. W. 1032. See, also, Henderson v. Ry. Co., 17 Tex. 560, 67 Am. Dec. 675; Connally v. Saunders (Tex. Civ. App.) 142 S. W. 975. The facts in this case bring it very closely to and within the principles involved in Paschen v. Lovett (Tex. Com. App.) 255 S. W. 385, and Rabenau v. Harrell, 278 Mo. 247, 213 S. W. 92.

[8] The defendants complain that evidence of other transactions was improperly admitted; that the experiences of other colonists from Illinois and other states with these same defendants with regard to similar land and about the same time as plaintiff's transaction are rei inter alia. But I do not understand that such evidence, when offered, is denied competency or relevancy in any jurisdiction, if we consider the question of intent. Where the fraudulent intent of a party in the performance of an act is in issue, proof of other fraudulent acts is relevant and admissible to establish his intent or motive in the performance of the act in question, when it appears that there is such a connection between the other acts and the act in question as to furnish the inference that both are a part of one schedule or plan in which the same motive is operative. Jack v. Life Assurance Co., 113 Fed. 49, 51 C. C. A. 36; United States v. Kenney (C. C.) 90 Fed. 257; N. Y. Mut. Life Ins. Co. v. Armstrong, 117 U. S. 591, 6 Sup. Ct. 877, 29 L. Ed. 997; Butler v. Watkins, 13 Wall. 456, 20 L. Ed. 629; Huthmacher v. Lowman, 66 Ill. App. 448; Lockwood v. Doane, 107 Ill. 235; Gray v. St. John, 35 Ill. 222; Raby v. Frank, 12 Tex. Civ. App. 125, 34 S. W. 777; Brown v. Greenfield Life Ins. Co., 172 Mass. 498, 53 N. E. 129; Miller v. Barber, 66 N. Y. 558; 6 Ency. of Evidence, 33. It is immaterial whether such other fraudulent acts occurred before or after the act in question, as remoteness in point of time affects only their weight. Mudsill v. Watrous, 61 Fed. 163, 9 C. C. A. 415; Penn Ins. Co. v. Mechanics'

Sav. Bk., 72 Fed. 413, 19 C. C. A. 286, 38 L. R. A. 33, 70; Horton v. Weiner, 124 Mass. 92.

[9] The defendants complain of an alleged variance, because the declaration charges that the plaintiff contracted to buy from the defendants; whereas, the written contract produced was with the Lone Star Immigration Company. The words "with defendants" were not necessary in the averments. The plaintiff was compelled to show only that the plaintiff contracted with defendants or some one else, if in fact she was damaged by a fraud from which defendants derived benefit, and in which they knowingly participated. It is immaterial with whom she contracted, and the two words, therefore, may be considered as surplusage. This is not a contract action or an action for rescission, but is an action for deceit and for the damages growing out of the same. Furthermore, the evidence shows that, while the plaintiff made a contract with the Lone Star for 47 acres, this was later modified by a verbal arrangement with Dickinson, by virtue of which she was released from the written contract and agreed verbally to buy the north 20 acres thereof. Hence the final contract was made with defendant Dickinson, either for himself, or for one of the companies, or for Thomas.

[10, 11] Nor can it be said that the statute of limitations of Texas bars this action. The evidence discloses that the plaintiff exercised due diligence to discover the quality and character of her land, and in spite of her diligence she did not discover and could not have discovered the fraud within such time as to be barred by the statute. Furthermore, the defendant corporation is a nonresident of the state of Texas, and the statute of the state expressly provides that it shall not run against absent defendants. So, whether there were any agents of the nonresident corporation within the state of Texas or not, under proper construction of the statute the corporation is an absent defendant, and cannot seek the protection of the statute of limitations. Foreign corporations, although having general agents and transacting business in a state, come within the provisions of those statutes which prevent the statute of limitations from running against foreign debtors, for they have no legal existence in the state, and are, consequently, absent within the meaning of the statute. Rathbun v. Northern Central R. R. Co., 50 N. Y. 656; Winney v. Sandwich Mfg. Co., 86 Iowa, 608, 53 N. W. 421, 18 L. R. A. 524; Wood on Limitations, § 250.

[12] The evidence amply supports the declaration. The actual damage to plaintiff is the difference between the actual value of the property she purchased, which was nothing, and the value which it would have had, had it been as represented to her. The latter value is $300 per acre, so that her actual damage is $6,000, and under the terms of the Texas statute the court is authorized to assess exemplary damages to at least an equal amount. The circumstances of this case amply warrant the court in the exercise of such discretion.

The judgment of the court will be that the plaintiff shall recover from the defendants the sum of $12,000 and costs of suit.