**C. D. MORRISON**
and
**Frank R. Morrison, Appellants,**

v.

**UNITED STATES of America,**
**Appellee.**

**No. 7734.**

United States Court of Appeals
Fourth Circuit.

Argued Jan. 13, 1959.

Decided Aug. 13, 1959.

Certiorari Denied Nov. 16, 1959.

See 80 S.Ct. 196.

Boreman, District Judge, dissented.

William Rosenberger, Jr., Lynchburg, Va., for appellants.

L. S. Parsons, Jr., U. S. Atty., Norfolk, Va., for appellee.

Before HAYNSWORTH, Circuit Judge, and PAUL and BOREMAN, District Judges.

PAUL, District Judge.

This is an appeal by C. D. Morrison from a conviction for evasion of income taxes for the years 1950 and 1951 and by Frank R. Morrison, who was convicted of aiding and abetting in the preparation of the tax returns of C. D. Morrison. Both men were tried before a jury and their conviction resulted in the imposition of a fine upon each of them. C. D. Morrison was in the building construction business and Frank R. Morrison, his brother, during the years in question, kept the books pertaining to the operation of the business.

The brief for appellants enumerates a large number of assignments of error ranging from a denial of appellants' motion for a directed verdict of acquittal to exception to the court's instructions and including, in between, alleged errors in the admission of evidence and alleged prejudicial statements by the United States Attorney in the course of the trial. It is sufficient to say that as to the great majority of the assignments of error we find that they not only relate to trivial matters which could not possibly have affected the outcome of the case, but also that they are so lacking in merit as not to require discussion. Apparently counsel came to the same conclusion for most of the assignments were ignored in argument and only a few were argued seriously and at length.

In spite of the fact that the record in this case is voluminous, including lengthy examination of witnesses and the presentation of many exhibits, analysis of the questions involved shows that they are not complicated. The taxpayer had reported a net income for the year 1950 of $1,797.03; and for 1951 a net income of $1,196.60. The indictment, based on the calculations of agents of the Internal Revenue Service, charged that the true net income for 1950 was $31,997.57 and for 1951 $43,730.74. In arriving at these results the revenue agents used what they termed "the bank deposits and expenditures method of computing income."

Basically, so it is testified, this involves the estimation of the gross receipts of a business by ascertaining the bank deposits made during the tax year, together with any other income shown to have been received but not placed in bank. To the total thus shown it is necessary to make numerous deductions and adjustments, such as, for example, eliminating amounts deposited as the proceeds of bank loans, amounts transferred from one bank account to another, any amounts received as gifts, and other adjustments of a similar sort, thereby determining the gross business receipts. From the amount thus found there is deducted all proper business expenses in order to arrive at the adjusted gross income. This, in turn, is subject to deduction for such items as contributions, interest paid, taxes, medical expenses, etc. The result,

after allowance for the exemptions for the taxpayer and his dependents, represents the taxable income.

The method outlined was applied by the accountants of the revenue service in the instant case and a large part of the testimony in the case was that of the agents in a detailed explanation and demonstration of how they arrived at the amount of the gross receipts of taxpayer's business and of the items of deduction and adjustment whereby they determined the taxable income. In reviewing this testimony we are of opinion that the taxpayer was treated fairly and that he was given the benefit of all allowances that could reasonably and properly be made in his favor. In the course of the investigation of the taxpayer's records, and before the making of the report on which the indictment was founded, the agents had several conferences with the defendants and their counsel, at which the defendants were given opportunity to explain any questionable matters and offer any information that might be favorable to them.

A significant feature of the case is that, except for a long and largely immaterial cross-examination, the defendants made no serious attempt to deny the accuracy of the figures presented by the government witnesses, including those representing the unreported income. They made no effort, through testimony from an accountant or any other witnesses, to show that the figures testified to by the government agents were in error or misleading. In fact the record is replete with statements made in the course of the trial that it was admitted that there had been an understatement of income, and we do not find it contended that the understatement was any less than the agents found it to be.

The tax returns in the years involved were prepared on a cash basis and among the errors assigned by defendants is one to the effect that the court refused to charge the jury that the returns should have been prepared on an accrual basis.

This complaint arose out of the fact that in the investigation of the taxpay-er's records the government agents had made computations of the tax deficiency based on the cash method of reporting income which was the method used by the taxpayer; and had also, as was known to counsel for appellants, computed the income on an accrual basis. Following the testimony of the government witness that, in investigating the case for criminal action, he had based his computations on a cash basis, which was the method used by the taxpayer, counsel for appellants sought to show that the returns should have been computed on an accrual basis. The agent readily admitted that the taxpayer's business was such as that computation of his income on an accrual basis would have been proper and would have more truly reflected his correct income. He admitted also that the computations of the taxpayer's income on an accrual basis had been made for the purpose of arriving at the deficiency for civil liability. From this the appellants argue that the prosecution used a hybrid method of computation in arriving at the understatement of income. However, the witnesses made it definitely clear that the computation on which the criminal action was based was made upon the accounting method actually used by the taxpayer. Witnesses for the prosecution did not contend that this computation was a correct measure of the true tax obligations for assessment purposes, and the taxpayer now contends, therefore, that this computation should not have been admitted in evidence.

It is quite true that such a computation would not be admissible if inquiry here was directed simply to the tax obligations of the taxpayer. In this criminal proceeding it was necessary to establish not only that the tax liabilities here were understated, but that the understatement was attributable, at least in part, to the fact that the taxpayer's returns were not honestly prepared. Proof of the latter fact could only be accomplished by adopting and consistently applying the taxpayer's own method of accounting, despite the fact that we are all agreed that the method, itself, is im-

proper, or less reliable than some other method. This computation, using the taxpayer's own method of accounting, establishes the fact that there were excluded items of taxable income, the omission of which resulted in an understatement of his tax liabilities, using the taxpayer's own accounting methods and without regard to adjustments, which inevitably result from changes in the accounting method. When the taxpayer has employed a hybrid or unauthorized accounting method, he is hardly in a position to complain when the computation employing that method is introduced to prove specific items of omitted income. Leeby v. United States, 8 Cir., 192 F.2d 331; O'Connor v. United States, 9 Cir., 175 F.2d 477; United States v. Frank, 3 Cir., 245 F.2d 284. See also Dupree v. United States, 5 Cir., 218 F.2d 781.

The case against the defendants was based on the contention that in both of the years in question substantial amounts had been received in the business which were not deposited in bank and not included in the reported income. Various items of this sort were traced and shown. It being admitted that there was an understatement of income for both 1950 and 1951, there remains the question of whether this was the result of a knowing and willful attempt to evade payment of income taxes justly due. The intention to evade payment of the tax is, of course, an essential element of the offense charged. It is in connection with this proof of intent that appellants urge earnestly that error was committed.

In undertaking to show that the taxpayer's omission from his reported income of various amounts paid to him was purposeful and intended and to negative any contention of mere mistake or inadvertence the government offered evidence that in years previous to those in question he had made a practice of filing returns in which similar omissions occurred. Specifically the government offered testimony to the effect that examination of the taxpayer's records and tax returns for the years 1947, 1948 and 1949 disclosed the same pattern of procedure, namely, the failure to deposit in bank or to include in his report of income various amounts which were part of his business receipts. This evidence was admitted over the objection of the defendants.

We find no error in the receipt of this evidence. It was admitted under the principle, long recognized and settled, that in the proof of a criminal intent it is permissible, in order to negative an assumption of accident or inadvertence, to show that the defendant has committed similar acts previously or that the act under investigation is one of a repeated pattern of conduct. As stated by Mr. Wigmore in his erudite work on the law of evidence (2d. Ed. Sect. 302):

> "The argument here is purely from the point of view of the doctrine of chances—the instinctive recognition of that logical process which eliminates the element of innocent intent by multiplying instances of the same result until it is perceived that this element cannot explain them all.

> \*   \*   \*   \*   \*   \*

> "In short, similar results do not usually occur through abnormal causes; and the recurrence of a similar result (here in the shape of an unlawful act) tends (increasingly with each instance) to negative accident or inadvertence or self-defense or good faith or other innocent mental state, and tends to establish (provisionally, at least, though not certainly) the presence of the normal, i. e. criminal, intent accompanying such an act;   \*   \*   \*."

In support of the principle stated in the text Mr. Wigmore cites and quotes from various authorities including among others those from which the following excerpts are taken.

Coleridge, C. J., in the English case of R. v. Francis (1874):

> "It seems clear upon principle that when the fact of the prisoner having done the thing charged is proved, and the only remaining question is

whether at the time he did it he had a guilty knowledge of the quality of his act or acted under a mistake, evidence of the class received must be admissible. It tends to show that he was pursuing a course of similar acts, and thereby raises a presumption that he was not acting under a mistake."

Grove, J., in another English case, Blake v. Assurance Co. (1878):

"When the question is whether an act was or was not fraudulent, acts of a similar kind are given in evidence to show intention."

Judge Taft in the case of Penn Mut. Life Ins. Co. v. Mechanics' Savings Bank & Tr. Co., 6 Cir., 72 F. 413, 422, says:

"It is a well established rule of evidence that, when the issue is the fraud or innocence of one in doing an act having the effect to mislead another, it is relevant to show other similar acts of the same person having the same effect to mislead, at or about the same time, or connected with the same general subject-matter. The legal relevancy of such evidence is based on logical principles. It certainly diminishes the possibility that an innocent mistake was made in an untrue and misleading statement, to show similar but different misleading statements by the same person about the same matter, because it is less probable that one would make innocent mistakes of a false and misleading character in repeated instances than in one instance."

For other cases applying this rule of evidence see Schultz v. United States, 8 Cir., 200 F. 234, 238; Seimer v. James Dickinson F. M. Co., D.C.Ill., 299 F. 651, 657; Holt v. United States, 6 Cir., 42 F. 2d 103, 105–106; Weiss v. United States, 5 Cir., 122 F.2d 675, 684. That the rule is one of long standing, see Bottomley v. United States, 3 Fed.Cas. pp. 968, 971, No. 1,688; Wood v. United States, 16 Pet. 342, 10 L.Ed. 987; Butler v. Watkins, 13 Wall. 456; 464–465, 20 L.Ed.

629; Castle v. Bullard, 23 How. 172, 186, 16 L.Ed. 424.

This evidence of a repeated course of conduct was permissible only for its bearing on the question of intent and, in presenting it, the District Attorney made it clear that he was offering it for that purpose alone. The court admitted it for that purpose and there is no reason to assume that the jury was under any misunderstanding as to its limited purpose. Of course the evidence of prior conduct was not conclusive as to defendant's intent in the years in question, nor was it claimed to be. It was merely one circumstance to be considered along with other evidence in determining whether there was an intention to defraud.

It appears that in making up the tax returns the defendants, while omitting from their stated business receipts various amounts which should have been included, also included some items which were not properly a part of the taxable income. The agents who investigated the case, in making their calculations, gave the defendants credit for these items improperly reported as income and the deficiencies heretofore mentioned were arrived at after giving this credit. The fact that the reported income, while omitting amounts which should have been included, also included amounts which should have been omitted, is urged by counsel as evidence that there was no intent to defraud and that the errors in the returns were due to a lack of knowledge as to what constituted taxable income. When coupled with the admitted fact that both defendants were men of little formal education and without training as bookkeepers the argument is pertinent and has force. But it was an argument to be directed to the jury, as no doubt it was. Against these aspects of the evidence favorable to defendants there were countervailing matters; as for example, that the defendants offered no evidence to deny the amount of the understated income; that the amounts improperly omitted from the income reported were much greater than the items improperly included, and that these omis-

sions appeared to be pursuant to an established practice. And finally when it was shown that the taxpayer's net income for one of the years in question was over $30,000 and for the other more than $40,000, a jury might well have doubted his good faith in reporting less than $2,000 for each year.

All of these facts whether favorable or unfavorable to the defendants, along with all others appearing in the evidence were for the jury to consider in arriving at its conclusions. We have read with care the instructions given the jury by the court and we find in them nothing to criticize. They are sound statements of the law applicable to the case, they are clear and complete and as favorable to the defendants as they could, in reason, desire. This court does not sit to hear cases *de novo*. Its function is to correct any errors that may have been committed in the trial court and an appellant assumes the task of pointing out any such errors. The record indicates that the defendants had a fair trial on issues submitted to the jury under proper instructions. They have not convinced us that any error was committed against them or that we would be justified in disturbing the verdict rendered by the jury. The judgment is therefore affirmed.

Affirmed.

BOREMAN, District Judge (dissenting).

Having profound respect for the opinions of the two Judges who have rendered the majority decision, I regret that I must disagree with them in stating a different view. After reviewing the record in this case in its entirety and finding it replete with error, I cannot, in good conscience, vote with the majority to affirm.

I think it is safe to say that all of us are in substantial agreement as to the general principles of law applicable in tax evasion cases. Certainly it is the function of the jury to determine the guilt or innocence of one accused of the commission of crime, provided that determination is founded upon proper evidence. But I am firmly convinced that if improper evidence, in substantial measure, was permitted to go to the jury and which may have influenced, confused and misled the jury in reaching a decision, the Appellate Court should not hesitate to correct the error.

The charges here against C. D. Morrison are the attempts, wilfully and knowingly made, to evade and defeat the payment of income taxes by filing false and fraudulent returns for the calendar years 1950 and 1951. Frank R. Morrison is charged with wilfully and knowingly aiding and assisting him, counseling, procuring and advising the preparation and filing of the fraudulent returns. One of the most important elements of these offenses is the intent, and without proper proof of wilful and knowing understatements of net taxable income, with intent to evade and defeat the payment of the income tax, or a substantial portion thereof, there can be no conviction.

There are seven principal assignments of error but, under subheadings, we have been asked to consider twenty specific errors in the admission of evidence, twenty-three errors attributed to statements made before the jury by the government's attorney, four in connection with the trial court's refusal to grant motions for a mistrial, three in the court's refusal of motions to strike evidence, and two in the court's refusal to charge the jury as requested. From this tortuous maze, I shall undertake to note certain ones which appear to merit consideration.

Each defendant filed a motion for a bill of particulars as to the specific nature of the evidence pertaining to each count of the indictment. The government simply replied that "the method of determining the correct income in this case was by use of the bank deposit method, corroborated by specific items of omitted income". The government declined to furnish any further information and the Court denied the motions for bills of particulars, but the action of the Court in this respect is not challenged

on appeal. Thus, the defendants and their counsel were notified as to the theory on which the case would be tried. Certainly there was no intimation that the case would be tried on the "net worth" theory, or that evidence properly admissible under that theory would be offered.

Under the government's theory here, that is, the use of the bank deposit method, corroborated by specific items of omitted income, each prosecution year is separate and distinct, not related to the other, and quite unlike the situation presented in a net worth case where it is necessary to determine a beginning net worth and trace additions, even through a long period of years, to arrive at increases in net worth during prosecution years.

First, the government offered in evidence a certificate of assessments and payments of taxes, the tax record of C. D. Morrison, for all years beginning with 1937 through 1949. A witness, when asked to explain it, stated: "This is what is known in the Internal Revenue Service as a certificate of assessments and payments as reflected from the taxpayer's returns that are filed by the years and any payments made in connection with those taxes". The introduction of such a certificate in a net worth case is designed to show the reporting of income during the years prior to the determination of the beginning net worth so as to negate any contention on the part of the taxpayer that he was not given proper credit for the ownership of assets which might be claimed by him as proper to be included in the beginning net worth. Defense counsel objected to the introduction of this certificate on the ground that it had no probative value. The Court inquired as to the purpose in offering it and government counsel replied: "This will give a picture going back in the years, particularly about '47, '48 and '49, as to why he paid no tax, and which have been admitted by the court in other cases". Then follows questions and answers:

"The Court: As far back as that?

"Mr. Parsons: Well, the only other case I could remember, Your Honor, is one where we went back to 1917, and the Court made us stop on that in 1941.

"The Court: That was for the purpose of getting the net worth value, though, was it not?

"Mr. Parsons: Yes, sir, that was one of the purposes in that case.

"Mr. Rosenberger (for defense): You are not following that in this case?

"Mr. Parsons: No, sir.

"The Court: Let me see the document. * * * I overrule the objection and admit it."

All of this took place in the presence of the jury.

The evidence disclosed that C. D. Morrison, after completing the fifth grade in a one room school and after a period of farming, went to Lynchburg, Virginia, where he worked as a carpenter until the year 1937. In that year, he started his own construction business, for some time maintaining his office in his home and employing one George Candler, a shoe factory machine operator, as his first bookkeeper. There were no returns filed by this taxpayer for the years 1937, 1938 and 1939, but the certificate of assessments and payments, admitted over objection and identified as Government's Exhibit No. 14, shows that a return was filed by C. D. Morrison in each year beginning with 1940 through 1949. It further shows that taxes *were* paid in small amounts for certain years, and for the year 1947 in the amount of $1,276.75. Certainly, this certificate was not admissible to give a picture "as to why he paid no tax" and that was the only reason assigned by the government counsel for its admission. What possible probative value could it have had without some showing that the taxpayer had a net income on which a tax was due and unpaid for the years shown in the certificate? But C. D. Morrison was not on trial for any of those years, only the years 1950 and 1951. It is more than

possible, and quite reasonable, to conclude that the jury may have been led to believe that this record indicated a failure on the part of C. D. Morrison to pay taxes which were due and owing to the government for the years shown in the certificate.

Before offering in evidence the tax returns for the prosecution years 1950 and 1951, the government offered in evidence C. D. Morrison's returns for 1947, 1948 and 1949. Objection having been interposed, extended discussion and argument ensued in the presence of the jury. In response to a question by the Court, government counsel stated: "If Your Honor please, the government will show, I believe, that there is a continuing pattern throughout these years, and the 1947 return will reflect the same pattern of activity. There are certain transactions that took place in the earlier years which do not pertain to the tax return made in 1947, but they still exist in '50 and '51". Counsel further stated: " * * * I have a specific purpose and I think it will be apparent, Your Honor. Of course, if they are not admissible at the proper time, the Court can throw them out".

The record is clear that the returns for '47, '48 and '49 were admitted in evidence and the Court did not indicate that they were admitted for any specific or limited purpose. Relative to the admission of the '48 return, the Court stated: " * * * and I shall admit subject to the same ruling. I take it that it may be understood that you object to all this line of testimony". Defense counsel replied: "Yes, sir, as to the tax returns for '47, '48 and '49".

The 1947 return was prepared by the bookkeeper who, as stated, was a shoe factory machine operator, and he was assisted by C. D. Morrison's daughter, then a recent High School graduate. In an apparent effort to show some pattern of omission of items of income in the year 1947, the government introduced evidence of receipts which were said to have been omitted from the reported 1947 income. But, under cross-examination, the agents admitted that certain items which *were* reported as income should never have been so reported and that these items amounted to approximately $14,000. The return for that year was prepared on a cash basis, and the gross business receipts shown were determined by adding together the items deposited to the checking account. Included in the list of receipts claimed to have been omitted was a check from a theater construction job in the amount of $10,000 which was not deposited in the bank account, but there was strong evidence that this check had been endorsed over to a supplier of materials in payment of an account due, and that the cost of the materials was not claimed as a deductible business expense. However irregular this transaction may have been from the bookkeeping standpoint, it could hardly be said to have been dishonest or that it affected the reported taxable income. The purchases of an automobile and certain items of equipment totaling approximately $4,500, for which payment was made in cash, were referred to and claimed as specific items of unreported income although there was absolutely no showing whether the cash so paid out was taxable income for 1947 or for prior years. Such evidence of cash expenditures would have been properly admissible under the "net worth" theory of computation of income. Another item of unreported income was $2,500 which represented the value of two lots which had been conveyed to C. D. Morrison in payment for work done and this amount, of course, was not reflected because not deposited in the bank account.

The reported income for 1947 erroneously included the end of the year 1946 bank balance, a check of approximately $8,500 representing a refund to C. D. Morrison for an accommodation purchase of a lot for a customer, the repayment of a loan for a prior year of $150, and a customer's bad check for $4,050 which had been redeposited after payment had been once refused, and the amount of which check was twice reported as in-

come. In fact, so far as the record discloses, and excluding from claimed omitted items the $10,000 check, the items incorrectly and ignorantly reported as income exceeded the total of omitted items by approximately $4,000. It will be remembered that for the year 1947, income taxes amounting to more than $1,200 were paid, and this may well have represented an overpayment rather than an underpayment, so far as disclosed by the record.

While there was testimony that certain items of income were unreported for the year 1948, the agents did not know what was included since there was no "work sheet" with the 1948 return. Evidence of omissions of income from the 1949 return was introduced; also evidence of errors in favor of the government for the same year was developed on cross-examination.

Apparently sensing the possibility of error, the government proposed to show by Special Agent Clagett that he had made a computation for the years '47, '48 and '49, which computation resulted in an understatement of taxes in each of those years. Government counsel stated: "Of course, it would be material only on the question of intent or motive; it is not proof of crime in those years, for any other purpose". The Court, as a part of a prolonged colloquy after observing that he had permitted the government to show the omission of certain specified items of income from the tax returns, stated: "I am inclined to think that as far as you should be permitted to go is to show, as you have already done, or introduce evidence showing, the omission of specified items for those years, but to go into a computation based upon a reconstruction of the tax liability for those years in an amount greater than the specified items omitted, it seems to me, would open up a mighty wide field there, Mr. Parsons".

Mr. Parsons was the United States Attorney and later the Assistant United States Attorney, Mr. Ryder, joined in the argument for the government and, in referring to the prior years, stated:

"There is an understatement of income. It is based on those omitted specific items, and we are entitled to show the jury that that resulted, as in these two years ['50 and '51] in a substantial understatement of the man's income". The Court replied: "Perhaps I misunderstood what you are driving at. Do you propose to show understatements for the previous years computed on the bank deposit method in an amount in excess of the omitted items"? Government counsel responded affirmatively. This exchange covers approximately twelve pages of the original record.

Following cross-examination and the testimony and admission of the agent that nontaxable items were included in the 1947 reported income, the same question was reopened and this later discussion covers approximately twenty-eight pages of the record. The government was still proposing to prove that there was an understatement of income in the years '47, '48 and '49. The United States Attorney, speaking for the government, was most insistent in his efforts to explain to the Court that the proof of the defendants' intent was one of the most important burdens imposed upon the prosecution. I shall quote at some length from his argument as follows:

"The state of the record now shows that the man omitted certain items; he put certain items in that should not have been there. What we propose to show is that, regardless of the items that he put in that he ought to have left out, in the prior years he understated his income and understated the amount of the tax due. That is the charge in the indictment. The law is that those prior offenses are admissible for the purpose of proving intent, and intent alone. The intent in this case is to understate the amount of tax owed to the government. We have not proved that in the prior years. We have only proof that he omitted certain items of income. Mr. Rosenberger has, in turn, proved that he put certain items in that should not

have been there. We have to prove that he has understated the amount of tax owed the government. That is the sole purpose of the evidence. We are not charging him with omitting certain items from his tax return; we are charging him with understating the amount of tax due and owing to the government and in order to prove that, we can·show it in a number of ways. The Court has not allowed us to prove that yet and the evidence is of no use to this Court or the jury until we prove that. * * * In this case it is the intent involved, that is, the understatement of tax owing. * * * We want to prove by this agent, and we have already proved that in '50 and '51 he understated the amount of tax owing. He did it by a certain method. The agent used a certain method of proof, that is, specific omissions and the bank deposits method. What we have shown in the prior years is only the method; that is what we are asking the Court to allow us to show, namely, the intent. I submit that the record as it now stands by merely omitting the items of income is erroneous now, because the Court could only introduce that evidence for the purpose of showing an intent to evade and defeat the payment of the tax."

This same line of argument continues over many pages but the Court steadfastly refused the government's request for permission to introduce testimony which, by the government's own admission, was necessary in order to bear upon the intent of the defendants in prior years and thus show a pattern of understatement *with intent to evade the payment of tax.* Certainly, this evidence as to happenings in prior years could have had no bearing on the intent of the defendant, Frank R. Morrison, because he was not employed by the defendant, C. D. Morrison, to handle the office work and prepare tax returns until the year 1949.

The only possible inference which the jury could or should have drawn from the evidence as to omission of income items in prior years, and the improper inclusion of large items, was that the returns were prepared by persons who had no idea whatsoever of bookkeeping and accounting and that the situation presented was, as characterized by defense counsel, a "comedy of errors". During the argument to the Court, government counsel again stated, positively and without equivocation, that C. D. Morrison *paid no tax* for the year 1947, but the government's own records showed this statement to be incorrect.

Even though the government had admitted error and had urged that it be granted the opportunity to remove it by the introduction of further testimony, the improper evidence remained before the jury, without explanation as to the purpose for which it could be received. Since the only basis for the introduction of such evidence, when properly developed, would be to show intent, and the jury was left with the impression that it could consider the evidence as to omissions in prior years, under the circumstances here revealed, as indicating a pattern of evil intent, I am convinced that the jury not only could have been, but probably was, confused and misled and that prejudicial error resulted.

Before the commencement of the trial, the government disclosed that the case was to be tried on the bank deposits method corroborated by omission of specific items of income. Calculations were presented to the jury based upon that method to show an understatement of tax for the years 1950 and 1951. Special Agent Clagett told the jury that his calculations were for prosecution purposes. But both the Internal Revenue Agent and the Special Agent had testified that, in their opinion, the accrual method of accounting and reporting was the method which should have been followed by the defendants. They then were permitted to reconstruct, for the years 1947 through 1951, the tax which C. D. Morrison

should have paid and which was claimed as due and owing to the government, based on the accrual method. They referred repeatedly to calculations made "for prosecution purposes" and other calculations made for the purpose of properly determining the tax due by the use of an entirely different method. Many items which were charged, by the use of one method, as omissions in the prosecution years 1950 and 1951, were shown, under the accrual method, as items which should have been reported in earlier years. In short, by the use of one method of accounting, it was charged that certain items were wrongfully omitted from reported income in the prosecution years and, by the use of another method, it was charged that the same items were wrongfully omitted from reported income in prior years.

The tax returns of Frank R. Morrison, charged with aiding, abetting, counseling, etc., C. D. Morrison for the calendar years 1949, 1950 and 1951, were offered by the government, and when objection was interposed, the government attorney stated: " * * * We anticipate we will be able to show a pattern in this individual's tax returns similar to that shown in the returns of C. D. Morrison". When reminded that Frank R. Morrison was not charged with filing false returns, the government counsel replied: " * * * This will be shown as proving intent. It will show a pattern that the jury could consider in evaluating the case". When the objection was sustained and the returns were identified but not admitted, government counsel then asked the witness if he had a certificate of assessment of tax for Frank R. Morrison and when objection was stated, the certificate was filed for identification only. But the jury could have drawn only one conclusion from these proceedings, that Frank R. Morrison was guilty of underreporting his own taxable income and of filing false returns as to his own taxes due. This is but another illustration of the zeal with which this prosecution was conducted and the de-

termined effort by government counsel to prejudice and influence the jury.

Far be it from me to criticize a vigorous prosecution and I admire a positive and fearless presentation of a well prepared case. However, I feel that it is the duty of all counsel and the Court to see that the case is presented fairly, with no undue advantage gained by innuendo, insinuation and improper inference.

The majority opinion states: "We have read with care the instructions given the jury by the court and we find in them nothing to criticize. They are sound statements of the law applicable to the case, they are clear and complete and as favorable to the defendants as they could, in reason, desire". But I observe that the defense counsel requested the Court to make some explanation to the jury as to the evidence pertaining to the use of the bank deposit method and the use of the accrual method, in view of the government's statement that the case would be tried on the bank deposit method. Counsel stated: "The government has exhibited to the jury a schedule showing the bank deposits and showing the tax computed on the results obtained by the bank deposits method. Then, when that method seemed to be slipping away in the course of yesterday or the day before, they put the revenue agent on to show the tax computed on the net income obtained by the accrual method. That is the point I am asking the Court to instruct the jury on: that the government has elected to proceed to show it was a false tax return, rather than by the bank deposits method, corroborated by specific items of omission".

Notwithstanding this request, the melange of theories, and the introduction into evidence of certain testimony and exhibits heretofore discussed, the Court simply told the jury: "You have listened to the evidence and I shall not undertake to review it in detail. In my opinion, no good purpose would be served by my undertaking to do so. I am sure it is fresh in your minds and your recollections as to the testimony of the various

witnesses and as to the various exhibits which have been filed, and that your recollection would be better than mine. In any event, you are the ones who have the responsibility of passing upon the effect of that evidence, and not the Court". Further on in the charge, and speaking concerning "intent", the Court told the jury: " * * * therefore, the only way you have of arriving at a conclusion as to the intention of the defendants in this case is for you to take into consideration all the facts and circumstances shown by the evidence, including, of course, the exhibits and testimony of the witnesses * * * ". With the highest regard for the ability of the trial judge to properly charge a jury, I venture the suggestion here that the jury should have been instructed as requested, and that some explanation should have been made as to the limits within which certain evidence could be considered and for what purposes.

Without specific reference to the cases examined, in my search I have found no case wherein it was shown conclusively, as here, that certain items were improperly included in tax returns for years prior to the prosecution years, which returns were offered by the government as bearing upon the taxpayer's intent in connection with proof of omitted items. It is evident in many of the cases examined that the failure to report specific items of income resulted in a determined tax deficiency. The testimony of the agents as to items improperly reported was elicited on cross-examination after the returns for prior years had been admitted. I am convinced that the United States Attorney, when urging permission to show an understatement of taxable income in prior years, was correct when he stated to the Court: "I submit that the record as it now stands by merely omitting the items of income is erroneous now, * * * ".

For the reasons stated, I would favor the granting of the motion to set aside the guilty verdicts and award a new trial to each of these defendants.