**PASCHEN v. LOVETT. (No. 472–3854.)**

(Commission of Appeals of Texas, Section A.
Nov. 7, 1923.)

**1. Vendor and purchaser ⬡3(3)—Rule for determining whether contract is one for sale of land or one of agency stated.**

A reliable rule for determining whether an instrument is a contract of sale of land or a contract of agency is to determine whether or not each of the parties may require specific performance of the contract for the sale and purchase of the land.

**2. Vendor and purchaser ⬡3(3)—Contract held one of agency and not for sale of land.**

A contract under which L. was given the exclusive privilege of selling certain land, deeds to be made to L. or his father, and notes for the purchase price to be assumed by the purchasers and delivered to the owner of the land, *held*, as respects rights of third parties against the owner, a contract of agency and not of sale, although, as respects the rights of the contracting parties between themselves, the contract may have conferred on L. an option to purchase.

**3. Vendor and purchaser ⬡274(3)—Purchaser may recover damages for fraud as offset against balance of purchase money.**

In case of fraud, a purchaser of land may stand on the bargain and, in action to foreclose vendor's lien, recover damages as an offset against the balance of purchase money.

**4. Fraud ⬡59(3)—Defrauded purchaser's measure of damages stated.**

The measure of damages of a defrauded purchaser of land is the difference between the true value of the property and the price paid.

**5. Vendor and purchaser ⬡285(3)—Judgment for defendant for land and canceling unpaid notes held proper.**

In action to foreclose vendor's lien, where defense of fraud was sustained, and it appeared that defendant had paid on the land more than it was worth at the time of sale, judgment authorizing defendant to retain the land and canceling defendant's unpaid purchase-money notes was proper.

Error to Court of Civil Appeals of Fourth Supreme Judicial District.

Action by T. F. Lovett against W. E. Paschen. Judgment for defendant was reversed and rendered by the Court of Civil Appeals (241 S. W. 685), and defendant brings error. Judgment of Court of Civil Appeals reversed, and that of district court affirmed.

J. T. Canales, of Brownsville, and Don A. Bliss, of San Antonio, for plaintiff in error.

Spears & Montgomery, of San Benito, for defendant in error.

GERMAN, J. Although in the beginning there were numerous parties to this suit, at the present time there are but two parties, T. F. Lovett, who will be called plaintiff, and W. E. Paschen, who will be called defendant. The suit originated in Cameron county, Tex., and was brought by Lovett to enforce the payment of certain notes and to foreclose a vendor's lien on lands for which they were executed. The notes were dated April 1, 1913, and were executed by Ralph R. Langley in favor of John Closner and W. F. Sprague. On that date Closner and Sprague executed a deed to Ralph R. Langley conveying certain lands, and a vendor's lien was retained to secure their payment. On the same day Langley executed a deed to defendant Paschen for these lands, and Paschen assumed the payment of the notes, acknowledging the existence of the lien to secure their payment. Defendant, Paschen, set up as a defense to the notes failure of consideration due to fraudulent representations made to him at the time of the purchase of the land by Ralph R. Langley, who was alleged to be the agent of Closner and Sprague, and claimed that Lovett acquired the notes after some of them were due, with knowledge of the fraud. There was also a plea of failure of consideration because of a breach of contract to furnish proper water and facilities for irrigating the land.

On a trial of the case before a jury, the written contract between Closner and Sprague on the one part and Ralph R. Langley on the other was introduced in evidence. The trial court held that this contract did not constitute Langley the agent of Closner and Sprague, but admitted parol proof on the question of agency. In response to special issues, the jury found (a) that Langley was the agent of Closner and Sprague in selling the lands to defendant Paschen; (b) that Langley at the time represented to Paschen that the lands were irrigated lands, and that there were abundant facilities to furnish water for irrigating these lands; (c) that such representations were false; (d) that defendant Paschen believed such representations, and was thereby induced to purchase the lands; (e) that if the lands had been in the condition represented by Langley and the representations had been true, the land would have been worth $175 per acre; (f) that it was really worth only $50 per acre; (g) that the notes were assigned to Lovett as collateral security for a debt due him by Closner and Sprague, and such assignment was made after some of the notes had become due.

On these findings the trial court rendered judgment in favor of Paschen, canceling the notes sued on, and denying a foreclosure of vendor's lien. This judgment was by the Court of Civil Appeals for the Fourth District reversed and rendered, allowing Lovett a recovery on the notes and a foreclosure

⬡For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

of the lien (241 S. W. 685), Judge Cobbs, however, dissenting.

We have concluded that the trial court and the Court of Civil Appeals are in error in holding that the contract made by Closner and Sprague with Ralph R. Langley was not an agency contract, and this makes it unnecessary for us to determine whether or not there was evidence, other than the contract itself, to justify the finding of the jury on the question of agency; and makes it also unnecessary to consider other contentions of defendant.

At the time this contract was made Closner and Sprague were the owners of a large body of land, situated some distance from the Rio Grande river, and which, without irrigation facilities, was worth very little. They undertook to develop a plan of putting the land under irrigation, and to sell it in small tracts as irrigated land, and to this end they entered into the contract with Langley, who was the directing head of the Standard Land Company, which was engaged in the business of bringing in homeseekers and selling lands. As the purpose and intention of the parties must be gathered from a consideration of the entire instrument, it is necessary for us to, briefly refer to a number of its provisions.

In the first clause of the instrument, it is stated:

"That parties of the first part [Closner and Sprague, Valley Reservoir & Canal Company, and Chapin Townsite Company] give and grant to party of the second part [Ralph R. Langley] for the term of two years from the 1st day of September, A. D. 1912, the exclusive right and privilege of selling and of purchasing all of the lands hereinafter described * * * for the prices and upon the terms and conditions hereinafter set forth."

In the second clause it is stated:

"The said party of the second part [Ralph R. Langley] agrees and binds himself to use his best efforts to sell all of said lands, either as a whole or in lesser subdivisions at the prices hereinafter named."

The third clause fixes the prices to be paid for the lands, while the fourth clause, among other things, provides:

"The purchase price in ring and to be paid to first parties by second party from and upon the sale of any of said lands shall be as follows."

The fifth clause stipulates that:

"When said lands are sold, or any part thereof, and the cash payment thereof has been paid to first parties, the respective owners thereof, and party or parties, the respective owners of such land so sold shall deed the same to said Ralph R. Langley or to James Langley, his father, as he may direct, who shall thereupon execute and deliver the said vendor's lien notes, as above provided, for the balance of the consideration for the tracts so sold. The parties

of the first part, or the respective owner of said land so sold shall convey said land by warranty deed as above provided."

Clause 6 provides that:

"In selling said lands, the said Langley may, if he shall so desire, take from the purchaser in lieu of a cash payment, other lands or property in trade, and, in the event of his so doing, he shall execute to first parties his promissory note due in six months from the date of sale, for the cash payment due first parties, arising from the sale of such lands, * * * but parties of the first part shall not be required to execute to said Langley a deed for any of such lands until said note has been paid."

Clause 7 provides that:

"In selling said lands it is understood and agreed that the said Langley shall advertise the same for sale and diligently promote the sale of said lands and to that end he shall use the organization of the Standard Land Company and such other organizations as he may desire, to the end that said lands shall be disposed of promptly within the time and according to the terms herein expressed."

Clause 8 binds Closner, Sprague, the Valley Reservoir & Canal Company, and the Chapin Townsite Company to obtain a release of the lien given by a certain mortgage "upon any tract or subdivision of said lands when sold as soon as the two first vendor's lien notes are paid."

Clause 10 provides:

"That any subdivision having as much as one-eighth or more of land not subject to be irrigated by gravity flow through the laterals of the Valley Reservoir & Canal Company may be eliminated from the contract and that 'in the event of a sale thereof to any purchaser before such condition has been ascertained, said purchaser shall have the right to rescind his contract of purchase at any time before the date of the first vendor's lien note of such purchaser matures.'"

Clause 11 is as follows:

"Second party agrees and binds himself, to use his best efforts, as above set forth, to sell all of said lands, and hereby consents to a forfeiture of this contract, unless he shall have sold, within the periods following, not less than 2,000 acres of land within 7 months after September 1, 1912; and not less than 3,500 acres of said lands within 13 months thereafter; and not less that 5,000 acres of said lands within 19 months thereafter; and the remainder of said lands within 24 months from September 1, 1912."

Clause 14 of said instrument provides that:

"If second party (Langley) shall fail to sell the quantity of lands provided for in any of the periods above stated or within the times therein limited, the first parties shall, at their option, have the right, upon any one of said defaults to declare this contract at an end."

Clause 16 provides as follows:

"It is understood and agreed that the said Langley may sell said lands in subdivisions smaller than 40 acres."

Clause 19 is as follows:

"All sales of any land made by second party, under the terms of this contract, shall in writing be reported to first party within twenty (20) days from the date when any such sale shall have been made."

[1, 2] There is absolutely nothing in this contract to create the relation of vendor and purchaser between the parties. As laid down by the Supreme Court in the case of Ansley Realty Co. v. Pope & Smith, 105 Tex. 440, 151 S. W. 525, a reliable rule for determining whether an instrument is a contract of sale of land, or a contract of agency, is to determine whether or not each of the parties may require a specific performance of the contract for the sale and the purchase of the land. In the present instance, while it might be true that Langley could have required a conveyance of any or all of the land to him or his father on compliance with the terms of the agreement, yet there is absolutely nothing in the contract which required or even contemplated that Langley could be required to purchase a single acre of the land. It did not even contemplate a purchase until the land was actually sold by him to some one else. At the most, as between the parties, it could have been no more than an option on the part of Langley to buy a part or all of these lands. However, whatever may be the nature of the agreement as between Closner and Sprague on the one part, and Langley on the other, as between Closner and Sprague and any or all prospective purchasers of the land, it clearly and manifestly creates Langley their agent for the selling of the lands. We believe that as to the rights of third persons the contract should be so construed as to protect their rights, if such construction be consistent with the clear import of the language used.

Langley and the Standard Land Company were engaged in the sale of lands. The other parties were extremely anxious to have their lands sold. It is manifest that the purpose of the contract was to enable Closner and Sprague to sell their lands, using Langley as an instrumentality to accomplish that end. The method of making · conveyances and passing title to purchasers was merely incidental to the main purpose of disposing of the lands. This is apparent from the use of the following language:

"In selling said lands it is understood and agreed that the said Langley shall advertise the same for sale and diligently promote the sale of said lands, and to that end he shall use the organization of the Standard Land Company and such other organizations as he may desire, to the end that said lands shall be disposed of promptly within the time and according to the terms herein expressed."

It is also provided that if he does not sell the lands to the extent of certain amounts within certain periods of time the contract may be forfeited. While the agreement provides that deeds to any lands that are sold by Langley shall be made to Langley or to his father, yet it is provided that the purchasers from Langley shall assume the payment of the notes given by Langley to Closner and Sprague, and this clearly indicates that Closner and Sprague, so far as the unpaid purchase money was concerned, were willing to accept and look to the purchasers and not to Langley for the payment thereof. The use of the language, "the purchase price inuring and to be paid to first parties by second party from and upon the sale of any of said lands," shows that even the cash payment received by Langley from a purchaser, up to a certain amount, was to be paid directly to Closner and Sprague. Besides, it is provided that no deeds are to be made to Langley until the land has been sold to other parties, and the record shows that in this instance the deeds to Langley and from Langley to Paschen were all made at the same time and were really but one transaction. We think it perfectly apparent that the true purpose of this contract was to constitute Langley the agent of Closner and Sprague for the sale of these lands, and the method adopted for making conveyances was for the purpose of allowing Langley to realize as a profit or commission for his services all amounts received above the prices fixed by Closner and Sprague, and for the further purpose of disguising the real transaction and seeking to avoid the results of representations made by Langley to purchasers of the land. This agreement falls in that class referred to in 31 Cyc. pp. 1203, 1204, in this language:

"A common mode of sale, especially of real estate, is by an option bond by the terms of which the prospective purchaser secures an option for the purchase of property on given terms within a stated time. Such a contract does not per se constitute the option holder the owner's agent, and if the transaction is really what it purports to be it creates the relation of possible vendor and purchaser. But where the option bond is a mere form of agency given to secure to the agent control of the negotiations, or to lend to him the appearance and character of a purchaser for its effect on third persons with whom the agent may negotiate, and it was not contemplated that the agent should really acquire any title or become the purchaser, then the contract is one of agency, and not of sale. And it has been said that the courts incline to construing such a contract as an agency rather than as a prospective sale."

We think it clear that as to purchasers this agreement created a sales agency between the parties, and Langley was the agent

of Closner and Sprague in the sale of the lands to Paschen. The fact that the contract may have conferred on Langley an option to purchase is not inconsistent with this construction. Shepard v. Pabst, 149 Wis. 35, 135 N. W. 158; Bean v. Bickley, 187 Iowa, 689, 174 N. W. 675; Baum v. Concord Land & Improvement Co., 24 Colo. App. 397, 133 Pac. 760.

This conclusion in no way conflicts with the decision in the case of Reeves and Lester v. McCracken, 103 Tex. 416, 128 S. W. 895. In that case but a single transaction was involved, and it was clearly shown that Reeves and Lester in no manner held Edwards out as their agent, but that Edwards, in his dealings with Mrs. McCracken, acted solely for himself.

The findings of the jury on all other issues are supported by the evidence, and all the circumstances of the case justify the conclusion that Lovett was charged with knowledge of the vice in the transaction between the parties at the time Paschen purchased the land.

[3-5] In the case of fraud, a purchaser of and may stand upon the bargain and recover damages as an offset against the balance of purchase money; his measure of damages being the difference between the true value of the property and the price paid. Riley v. Atmar (Tex. Civ. App.) 213 S. W. 682 (writ denied); Scalf v. Tompkins, 61 Tex. 476. The evidence shows that Paschen had paid on the land more than the jury found it to be worth at the time of the sale. He was therefore authorized to retain the land and cancel the unpaid notes. However, there seems to be no objection to the form of the judgment in this respect.

We recommend that the judgment of the Court of Civil Appeals be reversed, and the judgment of the district court affirmed.

CURETON, C. J. The judgment recommended in the resport of the Commission of Appeals is adopted, and will be entered as the judgment of the Supreme Court.